John P. Leschak, Esquire
N.J. Bar No. 03113 – 2010; Civil ID No. JL8921
**LESCHAK & ASSOCIATES, LLC**
180 South Street
Freehold, NJ 07728
P (732) 333-0806
F (732) 333-0900
john@justice4nj.com
*Attorney for Petitioner*

## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF NEW JERSEY

KARIM T. G.,
　　　　　*Petitioner*,

　　　　　v.

ATTORNEY GENERAL, JEFF SESSIONS,
　　　　　*Respondent*.

File No. A # 206 – 552 – 755

*Civil Action No*. 2:18-17175 (ES)

Filed electronically

## <u>CIVIL ACTION</u>

Date: April 24, 2020

TELEPHONIC ORAL
ARGUMENT REQUESTED

## <u>MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR</u>
## <u>ORDER TO SHOW CAUSE, AND PRELIMINARY INJUNCTION</u>
## <u>AND/OR TEMPORARY RESTRAINING ORDER,</u>
## <u>PURSUANT TO F. RULE 65, AND LOCAL CIVIL RULE 65.1</u>

<u>On the brief</u>:
John P. Leschak, Esq.

1

## INTRODUCTION

1.      Petitioner, Karim T. G. (a.k.a. "Karim"), is detained at Etowah County Detention Center, in Gadsden, AL, at the order of Respondent, pursuant to Immigration & Nationality Act ("INA") § 236(c), 8 U.S.C. § 1226(c).

2.      Petitioner files this Motion, seeking preliminary injunctive relief in the form of his immediate release from detention, as well as by restraining Respondent from re-detaining him for civil immigration purposes during the rest of his removal proceedings, including any appeals.

3.      As the global pandemic caused by the novel SARS coronavirus ("SARS-CoV-2," a.k.a. "COVID-19") disrupts daily functioning around the world and has taken over 195,313 lives and counting, Immigration and Customs Enforcement ("ICE") continues to refuse to release the most vulnerable immigrants in their custody, including Petitioner, who faces an imminent risk of death or serious injury in immigration detention if exposed to COVID-19.   Etowah, where Petitioner is detained, has at least three positive cases of COVID-19. (*See* "Exhibit A," Declaration of Petition, Karim T. G., at page 6, stating there are "at least 3 cases of COVID-19…").

4.      ICE's decision to continue detaining Petitioner ignores this rapidly-changing reality, disregards precedent in this Circuit, and infringes on Petitioner's due process rights under the United States Constitution. Without action by this Court, Petitioner will likely be infected with COVID-19 and be left without access to adequate treatment, leading to near-certain serious medical complications and possibly, death. In light of these serious, imminent risks to his health, Petitioner must be immediately released to safeguard his right to life.

5.      Petitioner is likely to succeed on the merits of his claims that ICE's inaction violates his due process rights, that he will suffer irreparable harm absent immediate action by this Court, and that the balance of equities weighs in his favor. Accordingly, Petitioner respectfully asks that

this Court issue an order pursuant to Federal Rule of Civil Procedure 65 and Local Civil Rule 65.1 requiring Respondent to release him immediately on his own recognizance.

## **ARGUMENT**

6.      Petitioner is entitled to a preliminary injunction and temporary restraining order instructing ICE to release him before he suffers serious consequences from COVID-19 because he has demonstrated "(1) a likelihood of success on the merits; (2) that [he] will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the public interest favors such relief." *Arrowpoint Capital Corp. v. Arrowpoint Assett Mgmt., LLC*, 793 F.3d 313, 318-19 (3d Cir. 2015); *see also Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 20 (2008)). This standard for preliminary equitable relief requires the Court to balance the four factors as long as the movant can establish the first two. *See*, *e.g*., *Oburn v. Shapp*, 521 F.2d 142, 147 (3d Cir. 1975).

7.      Petitioner has shown irreparable harm as well as a sufficient likelihood of success on the merits and the balance of hardships tips decidedly toward the Petitioner.

### **I.)      Petitioner will suffer irreparable harm absent preliminary relief.**

8.      The moving party bears the burden of establishing "that irreparable injury will result to him if [relief] is not granted." *A. O. Smith Corp. v. FTC*, 530 F.2d 515, 525 (3d Cir. 1970) (*quoting Joseph Bancroft & Sons Co. v. Shelley Knitting Mills, Inc*., 268 F.2d 569, 574 (3d Cir. 1959) (footnote omitted)).  Moreover, "a preliminary injunction shall not issue *except upon a showing of irreparable injury*." *A.O. Smith Corp*., 530 F.2d at 525 (*quoting National Land & Investment Co. v. Specter*, 428 F.2d 91, 97 (3d Cir. 1970) (emphasis added).

9.      Petitioner suffers from asthma, for which he currently uses an inhaler. (*See* "Exhibit A," Petitioner's declaration; and "Exhibit B," letter from Petitioner's doctor) As a person who

suffers from asthma, Petitioner is at high-risk of serious medical complications, and possibly death, if he is infected by the Novel Coronavirus 19 ("COVID-19"). (*See* "Exhibit C," statement by infectious disease specialist Dr. Carlos Franco-Paredes, MD, MPH, stating that those with asthma, are "considered at high risk of severe illness and death should they be infected;" *and* CNN, "Asthma and coronavirus: Act now to decrease your chance of a serious outcome," April 21, 2020, stating, "Asthma is one of the underlying health conditions that puts one at higher risk for a more severe case of Covid-19…").

10.     As a black man, Karim is also at higher risk, as COVID-19 has affected blacks and African Americans at a rate disproportionate to their percentage in the population. (*See* "Exhibit D," Science News, "Why African-Americans may be especially vulnerable to COVID-19," April 10, 2020, stating, "African-Americans are more likely to die from the disease than white Americans;" *and* Mother Jones, "COVID-19 Has Infected and Killed Black People At Alarming Rates. This Data Proves It," April 17, 2020, stating, "Preliminary data analysis by Mother Jones finds that Black people overall have disproportionately contracted and died from the coronavirus.")

11.     Cases of COVID-19 have been identified at Etowah, where Petitioner is detained. Respondent has not and cannot adequately protect Petitioner and other ICE detainees from contracting the deadly COVID-19.  As of April 24, 2020, at 5:30pm, Johns Hopkins University & Medicine reports globally there are 2,789,315 confirmed cases of COVID-19 infected patients and 195,775 deaths. In the United States, there are 889,661 infected patients and 50,890 deaths.

12.     According to the Petitioner, he is currently "experiencing shortness of breath and an accelerated heart rate just from going up a flight of steps." ("Affidavit of Fact showing entitlement to Relief, by Petitioner, Karim T. G.")  However, he is not sure whether or not he had or has COVID-19, because he has not been tested for the virus.  Nevertheless, he is worried about

the "risk of getting serious complications and possibly dying" from COVID-19, since he suffers from asthma. (Id., page 1)

13.    According to Petitioner, although officers at Etowah wear masks, they do not wear gloves.  Furthermore, "[t]he masks are not worn all day nor do they get changed. They use the same mask everyday (which are the same short-term mask we were given). The masks used by staff aren't changed regularly; they are only good for 8 hours, but are used for weeks." (Id., page 2)  Additionally, "soap needs to be bought at the commissary, and the jail is still receiving new detainees." (Id.)  Petitioner further states that the "use common toilets with no toilet covers," and also "shower together, as well as sleep and eat together." (Id.)  According to Petitioner, "it is impossible to do social distancing, because there are currently many detainees in the jail," and "the jail is still bringing more new detainees into the facility." (Id.)  Making matters even worse, the jail "is not following proper disinfecting protocols so detainees need to clean commonly used areas themselves." (Id.)

14.    According to Petitioner, on March 20, 2020, a new detainee was brought to his unit, but he reported feeling sick, so officers took him to the medical unit, and the detainee was subsequently restricted to his cell, but was not quarantined. (Id.)  When Petitioner and other detainees raised concerns over this, the officer in their unit demanded they return to their cells, and threatened them with violence if they did not comply. (Id.)  This escalated the situation, leading Petitioner and another detainee to say they would attempt suicide if the issue was not immediately addressed. (Id., page 3) After this, the jail relented and offered the detainees masks. (Id.)

15.    According to Petitioner, "After that, some of the detainees in my unit were provided one surgical mask each. We still have those face-masks, but they have not changed them since [April] 10th and so they are just for show, like the masks the officers are wearing." (Id.)

5

16.     As a person who suffers from asthma, Petitioner is at high-risk of serious medical complications, and possibly death, if he is infected by COVID-19. (*See* "Exhibit C," statement by infectious disease specialist Dr. Carlos Franco-Paredes, MD, MPH, stating that those with asthma are "considered at high risk of severe illness and death should they be infected").

17.     On March 19, 2020, Scott A. Allen, MD, FACP, and Josiah Rich, MD, MPH, two doctors with unique expertise in medical care in detention settings and who are medical experts for the Department of Homeland Security's Office of Civil Rights and Civil Liberties, wrote a letter to the Committee Chairpersons and Ranking Members of the House and Senate Committee on Homeland Security and Committee on Oversight and Reform to share their concern about the imminent risk to the health and safety of immigrant detainees and the public at large as a result of the congregate nature of detention settings. (*See* "Exhibit E," Letter from Drs. Allen and Rich to House Committee on Homeland Security, Senate Committee on Homeland Security and House Committee on Oversight and Reform (Mar. 19, 2020))

18.     They explain how Social distancing is essential to slow the spread of the COVID-19 virus. However, in group settings, like detention centers (such as Etowah), social distancing is an oxymoron because of the concentration of people in a close area with limited options for creating distance between each other. As a result, detention centers are at a very high risk for an outbreak of infectious disease. (Id.)

19.     A similar conclusion was reached by Dr. Robert B. Greifinger, MD. (*See* "Exhibit F," Declaration of Robert B. Greifinger, MD (Mar. 14, 2020)) Dr. Greifinger worked in health care for prisoners for 30 years including at Rikers Island, New York and as an independent consultant for the U.S. Department of Justice, Division of Civil Rights and DHS' Section for Civil Rights and Civil Liberties. ("Exhibit F," page 1)

20.     In a statement dated March 14, 2020, Dr. Greifinger concludes that, "The conditions of immigration detention facilities pose a heightened public health risk to the spread of COVID-19, even greater than other non-carceral institutions." (Id., page 2) Dr. Greifinger compared the enclosed environments of immigration detention facilities to the cruise ship that had the largest concentration of COVID-19 at the time and went on to explain why they have an even greater risk of infectious spread. (Id.) "People live in close quarters and cannot achieve the 'social-distancing' needed to effectively prevent the spread of COVID-19. Toilets, sinks, and showers are shared, without disinfection between use. Food preparation and food service is communal, with little opportunity for surface disinfection." (Id.)

21.     The same conclusion was reached by Dr. Jonathan Louis Golob, MD, a specialist in infectious diseases and internal medicine. (See "Exhibit G," Declaration of Jonathan Louis Golob, MD (Mar. 13, 2020))  In a statement dated March 13, 2020, Dr. Golob explained how high-risk individuals in institutional settings such as an immigration detention center are at grave risk of severe illness because of COVID-19. (Id., page 2) Based on the recovered genomes of the virus that allow doctors to trace the spread of the virus, COVID-19 can spread rapidly in institutionalized settings. (Id., page 3) He also cited previous instances of outbreaks in jails to explain how COVID-19 will spread: "During the H1N1 influenza ("Swine Flu") epidemic in 2009, jails and prisons were sites of severe outbreaks of viral infection. Given the avid spread of COVID-19 in skilled nursing facilities and cruise ships, it is reasonable to expect COVID-19 will also readily spread in detention centers, particularly when residents cannot engage in proper hygiene and isolate themselves from infected residents or staff." (Id.)

22.     Dr. Ranit Mishori, MD, MHS, FAAFP, faculty leader for Georgetown University School of Medicine's Correctional Health Interest group, explains how mitigation strategies

including scrupulous hand hygiene and social distancing are not possible in immigration detention centers. (*See* "Exhibit H," Declaration of Dr. Ranit Mishori (MD, MHS, FAAFP) (Mar. 25, 2020)) They are under-resourced and ill-equipped to provide person protective equipment to detainees and their caregivers. (Id., page 5) Congregate settings allow for the rapid spread of infectious diseases especially when they can be passed from one person to another by droplets through coughing and sneezing. (Id.)

23.     There are more opportunities for transmission for people in close, crowded quarters that must share dining halls, bathrooms, showers and other common areas. (Id.) "Toilets, sinks, and showers are shared, without disinfection between use. Spaces within detention centers are often also poorly ventilated, which promotes highly efficient spread of diseases through droplets. Detainees often have a small number of telephones that they share, and which form their only contact with the outside world—including their family and lawyers." (Id.) In addition, detention centers are not able to provide the resources to implement the mitigation strategies. "Detention centers do not provide adequate opportunities to exercise necessary hygiene measures, such as frequent handwashing or use of alcohol-based sanitizers when handwashing is unavailable. . . High-touch surfaces (doorknobs, light switches, etc.) should also be cleaned and disinfected regularly with bleach to prevent virus spread, but this is often not done in jails and prisons." (Id.)

24.     Finally, Joseph J. Amon, Ph.D. MSPH, an infectious disease epidemiologist whose main areas of research relates to individuals in detention settings, points out that because there is increasing evidence of asymptomatic transmission the spread of the virus is in detention facilities is inevitable and will occur even if ICE isolates infected detainees because asymptomatic individuals spread the virus. (*See* "Exhibit I," Declaration of Joseph J. Amon, Ph.D. MSPH (Mar. 24, 2020)) Thus, the medical consensus on the dangerousness of detention is clear.

25.     In terms of how ICE is managing medical concerns related to COVID 19, according to ICE, allegedly "ERO has limited the intake of new detainees being introduced into the ICE detention system," and "ERO decided to reduce the population of all detention facilities to 70 percent or less to increase social distancing." (*See* "Exhibit J," ICE, "ICE Guidance on COVID-19," 04/13/20) However, Petitioner says detainees are showering, sleeping and eating right next to one another, making social distancing impossible. (*See* "Exhibit A," Statement by Petitioner) Karim further states that Etowah is still receiving new detainees, and "[s]ince the jail is still accepting new detainees, it is clear that they are not taking steps to 'reduce the detainee population' to ensure social distancing." (Id., page 6)

26.     ICE further claims that "[d]etainees are being tested for COVID-19 in line with CDC guidance," and that detainees "who meet CDC criteria for epidemiological risk of exposure to COVID 19 are housed separately from the general population." (*See* "Exhibit J," *supra*)  But, Karim states that he is not aware of detainees being tested, and furthermore, that it appears that detainees who have possibly been exposed to COVID 19 are still being placed in dorms with other detainees. (*See* "Exhibit A," *supra*) Although Karim himself was "screened" for COVID 19 on March 23, after he was told that he appeared to be "symptomatic," he was not quarantined; nor was he tested or provided any additional medical treatment for his symptoms. (Id., page 1)

27.     Etowah is subject to National Detention Standards that are issued by ICE, which set forth the medical care that must be provided to individuals in immigration detention. Etowah is subject to ICE's 2019 National Detention Standards ("NDS"). (*See* "Exhibit K," ERO Custody Management Division, Authorized Non-Dedicated Facility List, 03/02/20; *and* ICE, 2019 Operations Manual ICE Performance-Based National Detention Standards) Medical care is governed by section 4.3 of the 2019 NDS. (*See* "Exhibit K," 2019 NDS, section 4.3)

28.     On March 23, 2020, the CDC issued interim guidance on management of COVID-19 in correctional and detention facilities. (*See* "Exhibit L," CDC Interim Guidance) The guidance mentions many of the same risks of COVID-19 transmission noted above, and notes several others, including: the inability of detainees to exercise frequent handwashing, restrictions on soap or paper towels, the likelihood of introduction of the disease due to staff ingress and egress and detainee transfers, and limited options for medical isolation. (CDC Interim Guidance, at 2.) The CDC Interim Guidance provides recommendations on a wide range of topics, including protocols for medical isolation, quarantines, social distancing, prevention by cleaning and disinfecting, pre-intake screening, and temperature checks. (Id. at 3.) With respect to detainees at higher risk of severe illness from COVID-19, the guidance notes:

- They should not be cohorted with other infected individuals, and if cohorting is unavoidable, "all possible accommodations" should be made to prevent transmission;

- Detained populations have a higher prevalence of infectious and chronic diseases and are in poorer health than the general population, even at younger ages; (Id. at 16, 20.)

- Individuals who are quarantined or in medical isolation, should be housed, in order of preference, separately in single cells or as a cohort with 6 feet of personal space assigned each individual in all directions. (Id. at 16, 20 (providing six more granular types of preferences based on the type of wall, door, and ventilation).)

- One of the least desirable quarantine or isolation methods is to house detainees in a cohort, in multi-person cells without solid walls or a solid door, without excellent ventilation, without social distancing, and without an empty cell between occupied cells. (Id.)

29.     After the CDC Interim Guidance was issued, ICE released a second important policy document in the form of Memorandum dated March 27, 2020 ("Action Plan"), which is addressed to detention wardens. (*See* "Exhibit M," ICE Action Plan) The Action Plan recognizes that the "combination of a dense and highly transient detained population" presents "unique

challenges…to mitigate the risk of infection." (Id. at 1.) The Plan applies to ICE-dedicated facilities, but does not apply to "intergovernmental partners and *non-dedicated facilities*." (Id. at 1.) (emphasis added). Etowah is a non-dedicated facility, and therefore, is not subject to the Plan. The Memorandum confirms that ICE views the IHSC recommendations as "best practices," not commands or even performance standards, with the further caveat that the "CDC remains the authoritative source." (*Id*. at 1, 5 (providing a link to CDC Guidance on COVID-19 in Detention Facilities).) The Action Plan includes some, but not all of the CDC policies, and provides advice that sometimes conflicts with the CDC policies.

30.    Most recently, on April 10, 2020, ICE Enforcement and Removal Operations ("ERO") issued COVID-19 Pandemic Response Requirements. (*See* "Exhibit N," Pandemic Response Requirements) The Pandemic Response Requirements set forth "mandatory requirements" for all facilities housing ICE detainees as well as best practices. (Id. at 3.) Dedicated detention facilities—those housing only ICE detainees—*as well as non-dedicated facilities* with mixed populations, including local jails, "must" (1) comply with their applicable detention standards and facility contract; (2) comply with the CDC Interim Guidelines and the March 27, 2020 Action Plan; (3) notify the local FOD and FMC of known or suspected COVID-19 cases; and (4) notify the FOD and FMC "as soon as practicable" of any detainee meeting CDC's criteria for higher risk of harm, (id. at 5-7).

31.    Whereas the April 4, 2020 Docket Review Guidance drew the line for vulnerable individuals at sixty years of age and listed pregnancy as a qualifying condition for release, the Pandemic Response Requirements raise the age to 65 and omit pregnancy. The Pandemic Response Requirements also state all facilities housing ICE detainees must:

- Instruct staff and detainees to wear cloth face coverings when PPE supply is limited;

- Provide staff and detainees with no cost unlimited access to supplies for hand cleansing, including liquid soap, water, paper towels or dryers, and no-touch receptacles;

- Require all persons in the facility to avoid touching their eyes, nose, or mouth without cleaning their hands first;

- Prohibit sharing of eating utensils, dishes, and cups; and prohibit non-essential contact such as handshakes, hugs, and high-fives;

- Staff should clean shared equipment like radios and weapons;

- Where possible, restrict transfers of detained non-ICE populations and facilities; and

- "Efforts should be made" to reduce the population to approximately 75% of capacity, to promote social distancing. (Id. at 7-14.)

32.    According to Petitioner, while staff at Etowah are wearing masks, they do not change their masks regularly, so the effectiveness of such face-coverings is greatly reduced. He further states that Etowah is not providing detainees with unlimited soap, as required.  Instead, detainees are being required to buy soap from the commissary, since the jail has inadequate free soap supplies.  Petitioner also states that the jail is not engaging in adequate cleaning of shared spaces, leaving that disinfecting work to be done by detainees themselves. Furthermore, Etowah does not appear to be limiting or restricting transfers, since the jail is still receiving new detainees. And since the jail is still receiving detainees, it is clear that efforts are not being made to reduce the detainee population. (See "Exhibit A," declaration by the Petitioner)

33.    Furthermore, regardless of whether Etowah is complying or not with the COVID-19 Pandemic Response Requirements, those requirements fall short of the CDC benchmarks in many different ways, including that they:

- Do not require symptomatic detainees be given a mask and placed in medical isolation;
- Do not mandate nose and mouth coverings for those who cannot engage in social distancing;

12

- Do not present a plan for isolation when the number of people needing to be isolated exceeds existing isolation rooms or cells;
- Do not limit transportation of detainees;
- Do not identify what precautions should be taken to protect people with risk factors in ICE custody;
- Fail to include certain risk factors identified by the CDC and which ICE and their staff may not be aware;
- Do not urgently command risk factor screening measures, but merely requests them, without any timeline;
- Do not include nationwide surveillance, coordination, or communication measures.

34.     Respondent is defying CDC Guidelines by refusing to do the one thing he could to do comply with those guidelines – releasing individuals during the pandemic. Instead Respondent is affirmatively putting detained people at risk by confining them in close sleeping, eating, and living quarters. There is currently no way for Etowah to comply with CDC guidelines on social distancing and quarantining. Etowah holds individuals in close proximity.  People are less than six feet away from each other when they sleep, eat, and use common areas.

35.     Based on the above record, Petitioner has shown clearly that he may suffer irreparable harm in the form of serious medical harm and possibly death, as he is at high risk of being infected with COVID-19, and at high risk from suffering complications from it too. With respect to "irreparable harm," the "key aspect of this prerequisite is proof that the feared injury is irreparable; mere injury, even if serious or substantial, is not sufficient." *United States v. Commonwealth of Pennsylvania*, 533 F.2d 107, 110 (3d Cir. 1976).  In this case, the Petitioner is at risk of death without immediate action by this court, which is clearly irreparable.

36.     Furthermore, even if the harm from possible infection with COVID-19 is speculative, Petitioner has also already suffered a legal harm.  Here, Petitioner has already suffered harm to his constitutional due process rights as a result of ICE's refusal to release him in light of his asthma, which in the face of the documented spread of COVID-19 at Etowah and other

detention center will be exacerbated if he remains in detention. Because COVID-19 has already reached the facility where Petitioner is detained, and because that facility is simply not prepared to adequately protect Petitioner, his feared harm is ***imminent***.

37.     Furthermore, it is well settled that an alleged constitutional violation constitutes irreparable harm. *See*, *e.g.*, *Connecticut Dept. of Environmental Protection v. O.S.H.A.*, 356 F.3d 226, 231 (2d Cir. 2004) ("[W]e have held that the alleged violation of a constitutional right triggers a finding of irreparable injury.") (internal quotations and citations omitted); *Statharos v. New York City Taxi & Limousine Comm'n*, 198 F.3d 317, 322 (2d Cir.1999) ("Because plaintiffs allege deprivation of a constitutional right, no separate showing of irreparable harm is necessary."); *Jolly v. Coughlin*, 76 F.3d 468 (2d Cir. 1996) (clarifying that "it is the *alleged* violation of a constitutional right that triggers a finding of irreparable harm" and a substantial likelihood of success on the merits of a constitutional violation is not necessary) (emphasis in original); *Sajous v. Decker*, No. 18-cv-2447 (AJN), 2018 WL 2357266, at *12 (S.D.N.Y. May 23, 2018) (finding that immigrant established irreparable harm by alleging that prolonged immigration detention violated his constitutional due process rights).

38.     Here, Petitioner alleges that the government officials detaining him have deprived him of his right to due process by refusing to release him despite not being equipped to adequately protect him from COVID-19 and despite the inherent risks posed by his detention at ECDF.

39.     Even absent that constitutional harm, Petitioner faces substantial harm caused by the highly infectious COVID-19. Detention during this outbreak will by itself cause substantial irreparable harm to Petitioner. *See Sajous*, 2018 WL 2357266, at *12 (S.D.N.Y. May 23, 2018) ("'[T]he deprivation of [an alien's] liberty is, in and of itself, irreparable harm.'") (*quoting Peralta-Veras v. Ashcroft*, No. 02-cv-1840 (IRR), 2002 WL 1267998, at *6 (E.D.N.Y. Mar. 29, 2002)).

40.     This harm will be further exacerbated if, or more likely *when*, Petitioner contracts COVID-19. Because of his asthma, his chances of developing serious and possibly lethal medical complications are particularly high. As a person with asthma and a black man, Petitioner is at much higher risk of serious illness or death than the general population. According to the Center for Disease Control ("CDC"), persons with pre-existing or chronic underlying medical conditions, like Petitioner, "are at greater risk of getting very sick form this illness."[1] They specifically name, among other conditions "moderate to severe asthma," as a condition that triggers higher risk of severe illness from COVID-19.[2] Thus the serious illness or possible death that Petitioner faces constitutes irreparable harm.

**II.)     <u>Petitioner Is Likely to Prevail on the Merits of His Habeas Corpus Petition</u>.**

41.     In this case, Petitioner actually already prevailed on his habeas petition, which was granted and closed by this Court on December 9, 2019 (D.E. 43).  However, the Court did not order his immediate release.  Instead, the Court ordered a bond hearing to be conducted in the Immigration Court.  And when Petitioner appeared in the Varick St., NY Immigration Court on December 17, 2019, his bond request was denied. (D.E. 49-1) Petitioner appealed that bond denial to the Board of Immigration Appeals ("BIA"). (*See* "<u>Exhibit O</u>," BIA Briefing Schedule for Bond Appeal, dated 02/27/2020)

42.     Since Karim's bond appeal is still pending before the BIA, he remains detained.  In the meantime, in light of his continued detention during the COVID-19 pandemic, he now seeks to reopen his habeas proceeding, under Fed. R. Civ. P. 60(b).

---

[1]  *See* People at Risk for Serious Illness from COVID-19, Center for Disease Control ("CDC"), https://www.cdc.gov/coronavirus/2019-ncov/specific-groups/high-risk-complications.html ("Older people and people of all ages with severe underlying health conditions — like heart disease, lung disease and diabetes, for example — seem to be at higher risk of developing serious COVID-19 illness.").

[2] See Information for Healthcare Professionals: COVID-19 and Underlying Conditions, Centers for Disease Control ("CDC"), https://www.cdc.gov/coronavirus/2019-ncov/hcp/underlying-conditions.html, Case 1:20-cv-02518-AT Document 6 Filed 03/25/20 Page 7 of 18.

43.     Under Fed. R. Civ. P. 60(b), Petitioner seeks relief from the Court's prior judgment granting his writ of habeas corpus and closing his case, because he is seeking to reopen the habeas proceeding due to the ongoing COVID-19 pandemic, which: (1) constitutes a new phenomenon and "newly discovered evidence" under Rule 60(b)(2); (2) renders the prospective application of the Court's December 9, 2019 decision inequitable, under Rule 60(b)(5); and (3) also constitutes another reason justifying relief, under Rule 60(b)(6).  Respondent submits that he is likely to prevail on his Motion to Reopen under Rule 60(b).

44.     If his habeas case is reopened under Rule 60(b), Petitioner shall seek to amend his prior habeas petition to raise a claim that his continued detention violates the substantive due process clause of the Fifth Amendment, by subjecting him to punitive Conditions of Confinement. He will also seek to raise a claim that Respondent's deliberate indifference to his medical condition, as demonstrated by Respondent's failure to adequately protect him from COVID-19, also violates his due process rights under the Fifth Amendment.

45.     Petitioner is likely to succeed on the merits of his claim that ICE's failure to provide him with adequate protection from COVID-19 or to release him from custody violates his due process rights. Because ICE is subjecting Petitioner to unconstitutional, dangerous conditions without adequately protecting him or providing him with necessary health care to address his serious medical needs and is refusing to release him, ICE is infringing on Petitioner's constitutional due process rights under Third Circuit precedent.

46.     In fact, two Judges from this District have recently granted TROs based on similar claims to those which Petitioner now seeks to make. *See Cristian A.R. et al. v. Decker, et al.*, Case 2:20-cv-03600 (MCA), Document 26 (D.N.J. Apr. 12, 2020); *and Rafael L.O. v. Tsoukaris*, No. 20-3481, 2020 WL 1808843, at *8 (D.N.J. Apr. 9, 2020) (granting Emergency Motion for

Temporary Restraining Order for ICE detainees held at facilities in New Jersey under ICE's

discretionary authority pursuant to 8 U.S.C. § 1226(a)).  In *Cristian A.R.*, Judge Cox Arleo noted:

> The CDC has … explained that, among other things, the crowded and fluid nature of detention facilities, the inadequate hygienic supplies, and the limited options for medical isolation present "unique challenges for control of COVID-19 transmission among incarcerated/detained persons, staff, and visitors." *See* CDC March 2020 Interim Guidance ("CDC Interim Guidance"), at 2, ECF No. 20.1.[3] Consequently, practicing social distancing and ensuring proper hygiene to minimize the risk of infection are exceedingly difficult. Detainees who meet the CDC's criteria for "higher risk" are the most vulnerable to a detention facility's shortcomings. *See* Greifinger Decl. ¶ 5 (observing that "preliminary data from China" indicates that "20% of people in high risk categories who contract COVID-19 have died").

Case 2:20-cv-03600 (MCA), Document 26, at 4.

47.    Judge Cox Arleo continued her analysis on the likelihood of success, stating:

> Respondents argue that Petitioners cannot succeed on their conditions of confinement and medical claims because such challenges are not properly brought through habeas. *See* Gov. Br. at 18-19, 27. Federal courts, however, including the Third Circuit, have condoned conditions of confinement challenges through habeas. *See Aamer v. Obama*, 742 F.3d 1023, 1032 (D.C. Cir. 2014); *see also Woodall v. Fed. Bureau of Prisons*, 432 F.3d 235, 242-44 (3d Cir. 2005); *Ali v. Gibson*, 572 F.2d 971, 975 n.8 (3d Cir. 1978). Likewise, the Supreme Court has repeatedly leftmopen the question of whether detainees may challenge their confinement conditions via a petition for a writ of habeas corpus. *See Bell v. Wolfish*, 441 U.S. 520, 526, n.6 (1979) ("[W]e leave to another day the question of the propriety of using a writ of habeas corpus to obtain review of the conditions of confinement."); *Preiser v. Rodriguez*, 411 U.S. 475, 499 (1973) ("When a prisoner is put under additional and unconstitutional restraints during his lawful custody, it is arguable that habeas corpus will lie to remove the restraints making custody illegal."); *Ziglar v. Abbasi*, 137 S.Ct. 1843, 1862-63 (2017) (explaining that the habeas remedy, if necessity required its use, would have provided a faster and more direct route to relief for immigration detainees challenging a detention policy than a suit for money damages, as a successful habeas petition would have

---

[3] Petitioner in this case has submitted the same CDC Interim Guidance cited by Judge Cox Arleo as "Exhibit O."

required officials to place respondents in less-restrictive conditions immediately).

Furthermore, under 28 U.S.C. § 2241, a district court may exercise jurisdiction over a habeas petition when the petitioner is in custody and alleges that his custody violates the Constitution, laws, or treaties of the United States. See 28 U.S.C. § 2241(c); *Maleng v. Cook*, 490 U.S. 488, 490 (1989). Petitioners in this action claim that their continued detention in their current conditions of confinement violates due process. Accordingly, ***this Court finds that Petitioners may challenge their conditions of confinement through a 28 U.S.C. § 2241 petition for writ of habeas corpus***.

Respondents next assert that Petitioners cannot establish a likelihood of success on the merits of their constitutional claims because they are lawfully detained pursuant to the discretionary detention statute, which permits detention of individuals in removal proceedings before a final order of removal. Gov. Br. at 20-21 (citing 8 U.S.C. § 1226(a)). Petitioners, however, have not asserted that they have a procedural or substantive due process right to be released on bond pursuant to 8 U.S.C. § 1226(a); rather, they have asserted claims for violations of their substantive due process rights, arguing that their conditions of confinement amount to punishment under the Due Process Clause and that Respondents' policies evince deliberate indifference to their serious medical needs.

The Court first considers whether Petitioners have a likelihood of success on the merits on their claims that their conditions of confinement at the Facilities amount to punishment. Because Petitioners are civil detainees as opposed to prisoners who have been convicted and sentenced, their conditions of confinement claims are analyzed under the Due Process Clause of the Fifth (or Fourteenth) Amendment, as opposed to the Eighth Amendment. *See Bell*, 441 U.S. at 535-36. Convicted and sentenced prisoners are protected from punishment that is "cruel and unusual," while pretrial and civil detainees are protected from any punishment. *See Hubbard v. Taylor*, 399 F.3d 150, 166-67 (3d Cir. 2005). The law in the Third Circuit is clear that civil immigration detainees are entitled to the "same due process protections" as pretrial detainees with respect to conditions of confinement. *See E.D. v. Sharkey*, 928 F.3d 299, 306-07 (3d Cir. 2019). An immigration detainee can bring a claim for violation of those protections when the conditions of confinement fall below constitutional minimums. *Id*.

[….]

Because Plaintiffs are immigration detainees and not convicted prisoners, the Court asks whether the challenged conditions are reasonably related to a legitimate governmental objective. If they are not, the Court may infer "'that the purpose of the governmental action is punishment that may not be constitutionally inflicted upon detainees qua detainees.'" *Sharkey*, 928 F.3d at 307 (*quoting Hubbard v. Taylor*, 538 F.3d 229, 232 (3d Cir. 2008)). A complained-of condition or deprivation amounts to punishment if: "the disability is imposed for the purpose of punishment"—that is, there is "an expressed intent to punish on the part of detention facility officials"; no "alternative purpose to which [the condition or deprivation] may rationally be connected is assignable for it"; *or* the condition or deprivation is "excessive in relation to the alternative purpose assigned [to it]." *See Bell*, 441 U.S. at 538 (*quoting Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168-69 (1963)). [….]

Addressing this question in light of the COVID-19 pandemic, in *Thakker v. Doll*, 2020, WL 1671563, at *8 (M.D. Pa. Mar. 31, 2020), Judge Jones reasoned that placing immigration detainees in close proximity and in unsanitary conditions did not meet a legitimate governmental objective. He further explained that although preventing civil immigration detainees from absconding, standing alone, constituted a legitimate governmental aim, this objective was deeply weakened in light of the COVID-19 pandemic, particularly when ICE had many other options to monitor civil detainees. *Id.*

… Judge Vasquez [from this same District] reached a similar conclusion in *Rafael L.O*. There, he found that the ***conditions of confinement*** at Essex County Correctional Facility ("ECCF"), including the volume of ECCF detainees confined to inherently limited living and sleeping quarters, limited access to hygiene products, shared bathroom facilities, and the transmission of COVID-19 to detainees in custody, ***amounted to punishment of the Petitioners, who had underlying medical conditions that made them vulnerable to serious complications or death if they contract the virus***. *Rafael L.O*., 2020 WL 1808843, at *7-8. Judge Vasquez further determined that "[t]he Respondents [did not] have an express intent to punish Petitioners" but found "that such intent is not a necessary prerequisite" to a claim under *Bell*. *Id*. at *7. ***The reasoning of Thakker and Rafael L.O. apply with equal force here. The totality of the circumstances compel a finding that the conditions of confinement at the Facilities are tantamount to punishment and therefore unconstitutional***.

Case 2:20-cv-03600 (MCA), Document 26, at 16 – 21 (emphasis added) (footnotes omitted).

48.     Although the Respondent may have legitimate objectives for detaining Petitioner,

that is not the end of the legal analysis.  As Judge Vasquez explained in *Rafael L.O.*,

> the Court would — in normal circumstances — agree with the
> legitimate governmental objective analysis … But these are not
> normal times, and context (or factual reality) is important. To use an
> extreme hypothetical, consider if civil detainees were being housed
> in a facility that was in the direct path of a hurricane and that the
> facility was unlikely to withstand the force of the storm. The
> government would still have a legitimate governmental interest in
> ensuring that the detainees appeared for immigration court—but the
> government would not have a legitimate interest in housing the
> detainees in that particular facility during the hurricane. COVID-19,
> and its associated risks, is the difference maker — it changes the
> equation in evaluating the government's legitimate objectives.

*Rafael L.O. v. Tsoukaris*, 2020 U.S. Dist. LEXIS 62389, *20.  In light of the decisions in *A.R.* and

*L.O.*, Petitioner respectfully submits that he is likely to prevail on the same claims in this case.

**a.)** **Petitioner is likely to prevail on the merits of his due process claim.**

49.     Petitioner is likely to succeed on his claim that ICE's refusal to provide him

adequate protection during the COVID-19 outbreak violates the due process clause of the Fifth

Amendment of the United States Constitution.

50.     Immigrant detainees, even those with criminal convictions, are civil detainees

entitled to the same Fifth and Fourteenth Amendment due process protections as any other pretrial

detainee. *See Zadvydas v. Davis*, 533 U.S. 678, 690 (2001); *E. D. v. Sharkey*, 928 F.3d 299, 306–

07 (3d Cir. 2019); *and Bell v. Wolfish*, 441 U.S. 520, 535 n.16 (1979) ("Due process requires that

a pretrial detainee not be punished.").

51.     The U.S. Constitution prohibits pretrial and civil detainees from being detained in

punitive conditions of confinement because the purpose of such detention is allegedly not punitive.

*Sharkey*, 928 F.3d at 306-307 ("immigration detainees are entitled to the same due-process

protections [as pretrial detainees]") (citations omitted). *See also Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017). As a result, immigrant detainees may not be punished in any manner. *Sharkey*, 928 F.3d at 307 (*citing Hubbard*, 538 F.3d at 231; *and Bell*, 441 U.S. at 535).

52.     Immigrant detainees may establish a due process violation for unconstitutional "conditions of confinement" by showing that a government official "knew, or should have known" of a risk of a condition of confinement that "posed an excessive risk to health." *Darnell*, 849 at 35. Where a risk is obvious, such as during a contagious disease outbreak, it is fair for a factfinder to assume that the government official was aware of the risk. *See, e.g.*, *Charles v. Orange County*, 925 F.3d 73, 87 (2d Cir. May 24, 2019) ("A factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.") (citations omitted); see also Helling, 509 U.S. at 33 (expressing "great difficulty agreeing that prison authorities may not be deliberately indifferent to an inmate's current health problems" where those authorities "ignore a condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year," such as "***exposure of inmates to a serious, communicable disease***") (emphasis added).

53.     "To determine whether challenged conditions of confinement amount to punishment, this Court determines whether a condition of confinement is reasonably related to a legitimate governmental objective; if it is not, we may infer 'that the purpose of the governmental action is punishment that may not be constitutionally inflicted upon detainees qua detainees.'" *Sharkey*, 928 F.3d at 307 (*quoting Hubbard v. Taylor*, 538 F.3d 229, 232 (3d Cir. 2008)). Put differently, to assess whether a condition constitutes impermissible punishment, "[w]e must ask, first, whether any legitimate purposes are served by these conditions, and second, whether these conditions are rationally related to these purposes." *Hubbard*, 538 F.3d at 232.

54.     The government has an affirmative duty to provide conditions of reasonable health and safety to the people it holds in its custody, and violates the constitution when it "fails to provide for his basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety" for those in custody. *DeShaney v. Winnebago County Dept. of Soc. Servs*., 489 U.S. 189, 199-200 (1989); *see also Union County Jail Inmates v. Di Buono*, 713 F.2d 984, 999, 1008 (3d Cir. 1983) (explaining that conditions are cruel and unusual when they "deprive inmates of the minimal civilized measure of life's necessities," such as the "necessity" of "habitable shelter," as measured under "contemporary standards of decency").

55.     Courts in this Circuit have repeatedly found "unsanitary, unsafe, or otherwise inadequate conditions" sufficient to state a Due Process claim. *Petty v. Nutter*, No. 15-3430, 2016 WL 7018538, at *2 (E.D. Pa. Nov. 30, 2016); *Grohs v. Lanigan*, No. 16-7083, 2019 WL 150061, at *11 (D.N.J. Apr. 5, 2019) (allegations of exposure to "extreme heat combined with lack of potable water, as well as generally unsanitary conditions" sufficient to state a conditions-of-confinement claim under the Fourteenth Amendment). Conditions that would violate the Eighth Amendment are more than enough to also violate a civil detainee's due process rights. *See Natale v. Camden Cty. Corr. Facility*, 318 F.3d 575, 581 (3d Cir. 2003) (explaining that the Fourteenth Amendment affords pretrial detainees protections "'at least as great as the Eighth Amendment protections available to a convicted prisoner'") (*quoting City of Revere v. Massachusetts Gen. Hosp*., 463 U.S. 239, 244 (1983)).

56.     Two judges from this District, Judge Cox Arleo and Judge Vasquez, have already found that exposing detainees with underlying medical issues to the risk of contracting COVID 19 is a condition of confinement which amounts to punishment under the Fifth Amendment. *See Cristian A.R. et al. v. Decker, et al*., Case 2:20-cv-03600 (MCA), Document 26 (D.N.J. Apr. 12,

2020); *and Rafael L.O. v. Tsoukaris*, No. 20-3481, 2020 WL 1808843, at *8 (D.N.J. Apr. 9, 2020).

Additionally, many courts across the USA are now reaching this same conclusion in the cases of

detainees with underlying medical issues. *See*, *e.g., Jimenez v. Wolf*, No. 18-10225-MLW (D.

Mass. Mar. 26, 2020) (ordering release of detained immigrant in the midst of the COVID-19

pandemic and noting that "being in a jail enhances risk" and that in jail "social distancing is

difficult or impossible"); *Basank v. Decker*, No. 1:20-cv-02518-AT (S.D.N.Y. Mar. 26, 2020)

(ordering the release of ten people from three immigration detention facilities in New Jersey

because "confining vulnerable individuals…without enforcement of appropriate social distancing

and without specific measures to protect their delicate health 'pose[s] an unreasonable risk of

serious damage to [their] future health'") (internal citation omitted); *Thakker v. Doll*, No. 1:20-cv-

00480-JEJ (M.D. Pa. Mar. 31, 2020) (ordering release of 13 people from three immigration

detention facilities in Pennsylvania because "preventative measures" against the "grave risk" of

COVID-19 cannot be practiced in "tightly confined, unhygienic spaces");  *Fraihat v. Wolf*, ED CV

20-00590 TJH (KSx) (C.D. Cal. Mar. 30, 2020) (ordering release of individual from immigration

detention facility because COVID-19 "can spread uncontrollably with devastating results in a

crowded, closed facility"); *In the Matter of the Extradition of Alejandro Toledo Manrique*, No. 19-

mj-71055, 2020 WL 1307109, at *1 (N. D. Cal. March 19, 2020) (ordering change to conditions

of bail to postpone incarceration, in part in light of risk of vulnerability to the coronavirus).

57.     To prevail on a claim that conditions of confinement violate the Fifth Amendment,

Petitioner must show: (1) that the deprivation alleged is objectively, "sufficiently serious," and (2)

the "prison official must have a sufficiently culpable state of mind," such as deliberate indifference

to the detainee's health or safety. *See Thomas v. Tice*, 948 F.3d 133, 138 (3d Cir. 2020) (quoting

*Farmer v. Brennan*, 511 U.S. 825, 834 (1994)); *see also Helling v. McKinney*, 509 U.S. 25, 33 (1993); *and Hutto v. Finney*, 437 U.S. 678, 682 (1978)).

58.     Petitioner can establish deliberate indifference based on circumstantial evidence that the risk is obvious. The obviousness of the risk the Petitioner faces, by itself, is enough to allow a factfinder to conclude that Respondents know of the risk. *Phillips v. Superintendent Chester SCI*, 739 F. App'x 125, 129 n.7 (3d Cir. 2018) (*citing Farmer*, 511 U.S. at 842).

59.     The conditions at Etowah are sufficient to demonstrate that Karim's constitutional due process is being violated. Keeping aliens detained in such close proximity to one another and without the sanitation necessary to combat the spread of the virus serves no legitimate purpose. Nor is detention under these circumstances rationally related to the enforcement of immigration laws.  This amounts to punishment.  As was acknowledged by the Third Circuit in *E. D. v. Sharkey*, the Court "may *infer* 'that the purpose of the governmental action is punishment,'" if the challenged condition of confinement is not reasonably related to a legitimate governmental objective. *Sharkey*, 928 F.3d at 307 (*quoting Hubbard*, 538 F.3d at 232) (emphasis added).

60.     This Court only needs to determine "first, whether any legitimate purposes are served by these conditions, and second, whether these conditions are rationally related to these purposes." *Hubbard*, 538 F.3d at 232.  Petitioner does not dispute that protecting the community and preventing aliens from absconding are legitimate objectives. However, the inquiry does not end there; those objectives must be "rationally related" to the challenged conditions.

61.     In this case, even if legitimate objectives for detention exist, the government cannot show that their objectives are rationally related to the risk of serious medical complications and possible death from COVID-19. Respondent cannot justify continuing to subject Petitioner to this extraordinary risk of illness and death with any legitimate government objective, particularly in

light of the alternatives available to them to supervise Petitioner. The danger posed by Petitioner's detention during the COVID-19 outbreak is "so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk" and violates their constitutional right to safety in government custody. *Helling*, 509 U.S. at 36. Petitioner's due process rights are also being violated because his conditions of confinement place him at serious risk of being infected with COVID-19 and Respondent is deliberately indifferent to this critical safety concern.

62.     COVID-19 is highly contagious, and can cause severe illness and death. Respondents are aware of and have completely disregarded the serious risk that COVID-19 poses to Petitioner. The risk that COVID-19 poses to Petitioner and other detainees is also obvious, including to Respondent. Two medical experts for the Dept. of Homeland Security have also identified the risk of COVID-19 spreading to ICE detention centers, recently warning Congress of the "tinderbox scenario" as virus spreads and the resulting "imminent risk to the health and safety of immigrant detainees" and the public.[4] ("Exhibit E;" *see also* "Exhibit P," The Intercept, "'Burials are cheaper than Deportations,'" April 12, 2020 (discussing conditions at Etowah))

63.     According to infectious disease clinician, Dr. Carlos Franco-Paredes, MD, MPH, immigrant detainees are a severely at-risk population for COVID-19 infections. (*See* "Exhibit C," Expert Witness Declaration of Dr. Carlos Franco-Paredes, MD, MPH)  The nature of detention facilities themselves make exposure and spread of the COVID-19 virus particularly harmful. Dr. Jaimie Meyer, an expert on infectious diseases in the context of jails and prisons, recently submitted a declaration in the Southern District of New York noting that the risk of COVID-19 to people held in New York-area detention centers, including the ECCF, "is significantly higher than in the community, both in terms of risk of transmission, exposure, and harm to individuals who

---

[4] Catherine E. Shoichet, Doctors Warn of "Tinderbox scenario" if Coronavirus Spreads in ICE Detention, CNN (Mar. 20, 2020), https://www.cnn.com/2020/03/20/health/doctors-ice-detention-coronavirus/index.html.

become infected."[5] Other experts in correctional services and infectious diseases predict the same. For example, one warned that, "An outbreak of the deadly virus inside the walls of a U.S. prison or jail is now a question of when, not if, according to health experts.").[6]

64.     ICE remains woefully unprepared and incapable of taking necessary precautions to protect people in their custody at Etowah. In an open letter to ICE, medical professionals warn that it is "impossible to ensure that detainees will be in a 'safe, secure and human environment,' as ICE's own National Detention standards state."[7]

65.     COVID-19 will be nearly impossible to contain at Etowah because of the close proximity between people: detainees live, sleep, and use the bathroom in close proximity with each other and are constantly in the presence of guards and other staff.

66.     In addition, behind bars, the most basic disease prevention measures are against the rules or simply impossible. It is impossible for detainees to take steps to protect themselves from infection, such as frequently washing his hands with soap, accessing hand sanitizer or gloves or separating themselves from other individuals.  Indeed, the primary recommended way to avoid the spread of the virus—social isolation—is effectively impossible in a jail setting.[8]

67.     Furthermore, contrary to their own binding Pandemic Requirements, ICE is keeping the most medically vulnerable immigrants detained, including at Etowah.  As proof of this, Petitioner is also submitting a statement from a fellow detainee, Faruk Ali I., who states that

---

[5] Declaration of Dr. Jaimie Meyer, Velesaca v. Wolf, 20-cv-1803, ¶ 7 (AKH) (S.D.N.Y. Feb. 28, 2020), ECF 42.
[6] See Declaration of Dr. Homer Venters, Fraihat v. U.S. Imm. and Customs Enforcement, 19-cv-1546-JGB, ECF No. 81-11 (C.D. Cal. Mar. 24, 2020) at ¶ 12 (opining that "the design and operation of detention settings promotes the spread of communicable diseases such as COVID-19"); Declaration of Dr. Carlos Franco-Paredes, id. at ECF No. 81-12 ("Franco-Paredes Decl.") ("Immigration detention centers in the U.S. are tinderboxes for the transmission of highly transmissible infectious pathogens including the SARSCoV- 2, which causes COVID-19. Given the large population density of immigration detention centers and the ease of transmission of this viral pathogen, the attack rate inside these centers will take exponential proportions, consuming significant medical and financial resources.") ("Exhibit C").
[7] https://nylpi.org/wp-content/uploads/2020/03/FINAL-LETTER-Open-Letter-to-ICE-From-Medical-Professionals-Regarding-COVID-19.pdf.
[8] Nicole Wetsman, Prisons and Jails Are Vulnerable to COVID-19 Outbreaks, The Verge (Mar. 7, 2020), https://www.theverge.com/2020/3/7/21167807/coronavirus-prison-jail-health-outbreak-covid-19-flu-soap.

he suffers from hypertension, essential NOS, hyperlipidemia, pre-DM, migraine and allergic rhinitis, and yet who remains detained without adequate protections to prevent him from being infected with COVID-19. (*See* "Exhibit Q," Statement from Faruk Ali I.)[9]

68.     The circumstances of this case make clear that release is the only means to ensure compliance with Petitioner's due process rights. Public health information makes clear that the only way to prevent infection is through social distancing and increased hygiene. (*See* "Exhibit R," CDC, "How to Protect Yourself and Others [from COVID-19]") The only course of action that can remedy these unlawful conditions is release from the detention centers where risk mitigation is impossible.  Consistent with the Due Process clause of the Fifth Amendment, ICE must release detainees where civil detention has become punitive and where release is the only remedy to prevent this impermissible punishment.

69.     It is impossible for Petitioner to protect himself from infection through social distancing and vigilant hygiene—the only known mitigation measures. ICE continues to arrest people and send them to Etowah.  Respondent has neither reduced the population of Etowah, nor has he done anything to ensure social distancing and proper hygiene.

70.     The World Health Organization, recognizing the threat to detained people from COVID-19, has urged that "[e]nhanced consideration should be given to resorting to noncustodial measures at all stages of the administration of criminal justice, including at the pretrial, trial and sentencing as well as post-sentencing stages."[10]

71.     Respondent has not "[e]nsure[d] that sufficient stocks of hygiene supplies, cleaning

---

[9] Faruk's last name has been abbreviated to simply "I" to protect his privacy, pursuant to standing orders of this court for all habeas matters.
[10] WHO, Preparedness, prevention & control of COVID-19 in prisons and other places of detention Interim guidance, at 4, available at http://www.euro.who.int/data/assets/pdf_file/0019/434026/Preparedness-prevention-and-control-of-COVID-19-in-prisons.pdf?ua=1.  This guideline applies to "immigration detention settings" as well. (Id., at 7.)

supplies, PPE, and medical supplies . . . are on hand." Compare CDC Guidance at 7 ("Exhibit L," CDC Interim Guidance). Respondent's cohorting practices also violate CDC guidance and increase the threat posed to Petitioner and other detainees.

**b.)** **Petitioner will prevail on his Fifth Amendment "State-Created-Danger" Claim.**

72.     The Due Process Clause "imposes a duty on state actors to protect or care for citizens in when the state affirmatively places a particular individual in a position of danger the individual would not otherwise have faced." *Gregory v. City of Rogers, Ark*, 974 F.2d 1006, 1010 (8th Cir. 1992) (en banc).

73.     The government violates an individual's right to due process when it (1) "affirmatively place[s] [the] individual in danger," (2) by "acting with 'deliberate indifference to [a] known or obvious danger.'" *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1062 (9th Cir. 2006); *Jones v. Phyfer*, 761 F.2d 642 (11th Cir. 1985), reh'g denied, 768 F.2d 1353 (11th Cir. 1985) (a constitutional right to protection by the state exists when there is a showing that the victim faces a special danger distinguishable from that of the public at large).

74.     "A duty of protection arises where the state has a custodial relationship with the individual, arising from such circumstances as incarceration in prison or involuntary commitment in a mental institution." *Davis v. Carter*, 555 F.3d 979, 982 n.2 (11th Cir. 2009). The only relationships that automatically give rise to a governmental duty to protect individuals from harm under the substantive due process clause are custodial relationships through which the government deprives individuals of their liberty and thus of their ability to take care of themselves. *White v. Lemacks*, 183 F.3d 1253, 1257 (11th Cir. 1999).

75.     The government acts with deliberate indifference to a known or obvious danger when it recognizes an unreasonable risk and actually knowingly exposes the petitioner. An

unreasonable risk includes future harm caused by conditions of confinement. *See Helling v. McKinney*, 509 U.S. 25, 33 (1993).

76.     Respondent has not complied with the CDC guidelines, and has affirmatively placed Karim at greater risk of contracting COVID-19 by practices that transfer people into and out of Etowah, and by using the cohort quarantining approach – which drastically increases the danger of the virus spreading. Respondent, thus, has acted with deliberate indifference to the clear elevated levels of threat caused to Petitioner.

### III.)     The balance of equities and public interest weigh in Petitioner's favor.

77.     "Before granting an injunction, a district court must balance the relative harm to the parties, i.e., the potential injury to the plaintiff if an injunction does not issue versus the potential injury to the defendant if the injunction is issued." *Novartis Consumer Health, Inc. v. Johnson & Johnson Merch. Consumer Pharm. Co*., 290 F.3d 578, 596 (3d Cir. 2002).

78.     Here, the balance of the equities and the public interest weigh heavily in favor of Petitioner. As discussed above, Petitioner seeks to avoid the irreparable harm that he will suffer if he continues to be detained in violation of his constitutional rights. The potential of irreparable injury to Petitioner is very high, as he is at risk of death.  The imminent harm to Petitioner greatly outweighs any harm that the government may suffer as a result of his release. The harm to the government if Petitioner is released—that it might be required to create conditions of release or re-detain him at some point in the future, after the pandemic ends—is purely fiscal or administrative.  Where, as here, "a plaintiff alleges constitutional violations, the balance of hardships tips decidedly in the plaintiff's favor despite arguments that granting a preliminary injunction would cause financial or administrative burdens on the Government." *Sajous v. Decker*, No. 18-cv-2447 (AJN), 2018 WL 2357266, at *13 (S.D.N.Y. May 23, 2018) (*citing Mitchell v.*

*Cuomo*, 748 F.2d 804, 808 (2d Cir. 1984)); *see also Hernandez v. Sessions*, 872 F.3d 976, 995 (9th Cir. 2017) (characterizing government's claimed fiscal and administrative harm as "minimal").

79.     Respondent may argue that the public interest opposes Petitioner's release, since Respondent has a legitimate interest in ensuring that Petitioner does not flee and in protecting the public. *See Nken v. Holder*, 556 U.S. 418, 435 (2009) (finding that the factors of injury to other party in the litigation and the public interest, merge in immigration cases because DHS is both the opposing litigant and the public interest representative).  However, even if we accept that the Respondent has legitimate public interests, those interests can still be met even if the Petitioner is released, since the Court has the power to fashion appropriate conditions of release and supervision, including electronic monitoring.

80.     Furthermore, contrary to the Respondent's likely argument that the public interest opposes relief, here the public interest actually supports Petitioner's release before he contracts COVID-19 to preserve critical medical resources and prevent further stress on the state's and country's already overburdened healthcare systems. *See Rafael L.O*., 2020 WL 1808843, at *9. No public interest is served by permitting the government to detain vulnerable individuals who are at heightened risk of severe illness or death should they be exposed to COVID-19 in a jail setting. Indeed, the public has an obvious interest in ensuring public health and safety. *See, e.g*., *Grand River Enterprises Six Nations, Ltd. v. Pryor*, 425 F.3d 158, 169 (2d Cir. 2005) (referring to "public health" as a "significant public interest"). The enormous resources already dedicated around the world demonstrate that the public has a compelling interest in containing the coronavirus pandemic. Fulfilling that interest is critical to preventing the transmission of the virus itself, avoiding overburdening health care facilities, and countless other effects that have been detailed over the last weeks and months. Public officials throughout the USA, including New Jersey, have

determined that, in light of the risks presented by the COVID-19 pandemic, the public interest compels lowering jail populations.[11]

81.     In fact, the United Nations High Commissioner for Human Rights has called on governments around the world to work to decrease jail populations in light of the spread of the virus, noting that detention "should be a measure of last resort, particularly during this crisis."[12] The High Commissioner "urged governments and relevant authorities to work quickly to reduce the number of people in detention" including "examin[ing] ways to release those particularly vulnerable to COVID-19, among them older detainees and those who are sick…" *Id*. Thus the release of Petitioner clearly serves the public interest. The longer he remains detained in jail-like conditions favorable to the spread of infectious disease, the more likely he is to be infected with COVID-19, suffer severe complications due to his asthma, infect others around him, and add to the overwhelming stress on local health care facilities.

82.     Moreover, apart from public health concerns, the public interest is also served when the laws are followed and constitutionally guaranteed process is provided. *See Sajous*, 2018 WL 2537266 at *13 ("The public interest is best served by ensuring the constitutional rights of persons within the United States are upheld.").

---

[11] *See, e.g.*, Zusha Elinson and Deanna Paul, Jails Release Prisoners, Fearing Coronavirus Outbreak, The Wall Street Journal (March 22, 2020), https://www.wsj.com/articles/jails-release-prisoners-fearing-coronavirus-outbreak-11584885600 ("Local governments across the U.S. [including in California, New York, Ohio, and Texas] are releasing thousands of inmates in an unprecedented effort to prevent a coronavirus outbreak in crowded jails and prisons."); Noah Higgins-Dunn, Coronavirus: New York City to release 300 nonviolent inmates from Rikers Island, CNBC (Mar. 24, 2020), https://www.cnbc.com/amp/2020/03/24/coronavirus-new-york-city-to-release-300-nonviolent-inmates-from-rikers-island.html (describing Mayor Bill de Blasio's desire to "release inmates who are over age 70 or who have any of the five preexisting health conditions that make them most vulnerable to the coronavirus"); Ganesh Setty and Kara Scannell, New Jersey will release low-level offenders from jail to prevent coronavirus spread, CNN (Mar. 24, 2020), https://www.cnn.com/2020/03/24/us/new-jersey-low-level-offenders-release-coronavirus/index.html (quoting New Jersey's Attorney General as saying "But this is the most significant public health crisis we face in our state's history. And it's forcing us to take actions that we wouldn't consider during normal times.").

[12] *See* Urgent action needed to prevent COVID-19 "rampaging through places of detention" – Bachelet, UNHCR (Mar. 25, 2020), https://www.ohchr.org/en/NewsEvents/Pages/DisplayNews.aspx?NewsID=25745&LangID=e ("The High Commissioner urged governments and relevant authorities to work quickly to reduce the number of people in detention, noting several countries have already undertaken some positive actions.").

## <u>CONCLUSION</u>

83.     For the foregoing reasons, Petitioner is entitled to a temporary restraining order and preliminary injunction ordering Respondent to release him, under any appropriate conditions, and enjoining Respondent from re-detaining him for the purposes of civil immigration detention, during the pendency of his removal proceedings.

DATED: April 24, 2020                    Respectfully submitted,
      Freehold, NJ                         ***<u>John P. Leschak, Esq.</u>***
                                     John P. Leschak, Esq.
                                     Attorney for Petitioner